1

2

3   O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  REDBOX AUTOMATED RETAIL,    )  Case No. CV 18-00677 DDP (AGRx)
    LLC,                        )
12                              )
                    Plaintiff,  )
13                              )
          v.                    )  **ORDER RE: DEFENDANTS' MOTION TO**
14                              )  **DISMISS**
    BUENA VISTA                 )
15  HOMEENERTAINMENT, INC.,     )
    DISNEY ENTERPRISES, INC.,   )
16  LUCASFILM LTD, LLC, MVL FILM )
    FINANCE LLC, AND MOVIES     )  [Dkt 58]
17  ANYWHERE LLC,               )
                                )
18                  Defendants. )
19  _____ )

20       Presently before the court is Defendants Buena Vista Home

21  Entertainment, Inc., Disney Enterprises, Inc., Lucasfilm Ltd. LLC,

22  MVL Film Finance LLC, and Movies Anywhere, LLC (collectively,

23  "Disney")'s Motion to Dismiss Plaintiff's First Amended Complaint

24  ("FAC").  Having considered the submissions of the parties and

25  heard oral argument, the court grants the motion in part, denies

26  the motion in part, and adopts the following Order.

27  **I.   Background**[1]

28  _____

         [1] The general factual background underlying this dispute is
                                               (continued...)

1   Disney is a major movie production studio.  (FAC ¶ 34.)
2   Disney's market share of movies rented or sold for home
3   entertainment is greater than 50%.  (Id. at ¶¶ 34-35.)
4   Plaintiff Redbox Automated Retail, LLC ("Redbox") rents and sells
5   movies on DVD and Blu-Ray discs via automated self-service kiosks,
6   which are located in grocery stores, fast-food restaurants, and
7   other locations throughout the country.  (Id. at ¶¶ 25-29.)  Redbox
8   generally acquires its stock of Disney movies by purchasing them at
9   retail outlets such as big-box stores and grocery stores.  (Id. at
10  ¶ 45.)  Redbox often bought Disney movies as part of a "Combo
11  Pack," which includes a DVD, a Blu-ray disc, and a digital movie
12  that can be accessed with a code contained within the Combo Pack.
13  (Id. at ¶ 46.)  Each digital movie code can only be redeemed once,
14  through one of two Disney websites (the "redemption websites").
15  (Id. at ¶ 47.)

16  In summer 2017, Redbox began selling the digital movie codes
17  from its kiosks.  (Id.)  Soon after, Redbox alleges, Disney began
18  pressuring distributors into refusing to sell retail copies of
19  Disney titles to Redbox.  (Id. at ¶¶ 49-56.)  Disney also includes
20  statements on Combo Pack packaging and on the digital movie codes
21  representing that the components of Combo Packs cannot be rented or
22  transferred separately.  (Id. at ¶ 60.)  The redemption websites
23  also represent that Disney owns "[a]ll digital movie codes," which
24  can only be redeemed by a person (or family member) who obtains the

25

26  [1](...continued)
laid out in more detail in this Court's orders in a closely related
27  case before this Court, Disney Enterprises, Inc., et al. v. Redbox
Automated Retail, CV 17-08655 DDP ("Redbox I").  The relatively
28  brief recitation of the facts herein is based upon Redbox's FAC in
this case.

1   code as part of a Combo Pack, and that the codes may not be sold

2   separately. (Id. at ¶¶ 61-62.) Redbox alleges that these

3   representations are false because, as a purchaser of a Disney Combo

4   Pack, Redbox has an unfettered right to dispose of the DVDs, Blu-

5   rays, and digital movie codes contained within the Combo Packs.

6   (Id. at ¶¶ 64-65.)

7      Redbox alleges that Disney's actions and misrepresentations

8   have stifled competition and dissuade consumers from purchasing

9   digital movies from Redbox. (FAC ¶¶ 92, 94.) The FAC alleges

10  causes of action for declaratory relief, copyright misuse, tortious

11  interference with prospective economic advantage, false advertising

12  under both state and federal law, unfair competition, and state and

13  federal antitrust violations. Disney now moves to dismiss all

14  claims.

**II. Legal Standard**

16      A complaint will survive a motion to dismiss when it

17  "contain[s] sufficient factual matter, accepted as true, to state a

18  claim to relief that is plausible on its face." Ashcroft v. Iqbal,

19  556 U.S. 662, 678 (2009)(quoting Bell Atl. Corp. v. Twombly, 550

20  U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a

21  court must "accept as true all allegations of material fact and

22  must construe those facts in the light most favorable to the

23  plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).

24  Although a complaint need not include "detailed factual

25  allegations," it must offer "more than an unadorned,

26  the-defendant-unlawfully-harmed-me accusation." Iqbal,556 U.S. at

27  678. Conclusory allegations or allegations that are no more than a

28  statement of a legal conclusion "are not entitled to the assumption

1   of truth." Id. at 679. In other words, a pleading that merely

2   offers "labels and conclusions," a "formulaic recitation of the

3   elements," or "naked assertions" will not be sufficient to state a

4   claim upon which relief can be granted. Id. at 678 (citations and

5   internal quotation marks omitted).

6       "When there are well-pleaded factual allegations, a court

7   should assume their veracity and then determine whether they

8   plausibly give rise to an entitlement of relief." Id. at 1950.

9   Plaintiffs must allege "plausible grounds to infer" that their

10  claims rise "above the speculative level." Twombly, 550 U.S. at

11  555-56. "Determining whether a complaint states a plausible claim

12  for relief" is "a context-specific task that requires the reviewing

13  court to draw on its judicial experience and common sense." Iqbal,

14  556 U.S. at 679.

15  **III. Discussion**

16      A.   Antitrust Claims

17      Disney argues that Redbox has not adequately alleged an

18  antitrust violation.  Section 1 of the Sherman Antitrust Act

19  prohibits contracts, combinations, and conspiracies that

20  unreasonably restrain trade.[2]  15 U.S.C. § 1; Brantley v. NBC

21  Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012).  Some

22  restraints, typically horizontal agreements between competitors,

23  are unreasonable per se.  Ohio v. Am. Express Co., 138 S. Ct. 2274,

24  2284 (2018).  All other restraints must be analyzed under the "rule

25

26      [2] The parties agree that federal cases interpreting the
    Sherman Act are applicable to claims under California's Cartwright
27  Act.  See, e.g. Pecover v. Elecs. Arts Inc., 633 F. Supp. 2d 976,
    984 (N.D. Cal. 2009); Marin Cty. Bd. of Realtors, Inc. v. Palsson,
28  16 Cal. 3d 920, 925 (1976).

of reason." Id.; Brantley, 675 F.3d at 1197. "In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." Leegin Creative Leather Prod., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007). To state a Section 1 claim under the rule of reason, a plaintiff must allege (1) an agreement, conspiracy, or combination between two or more entities that (2) the entities intend to harm or restrain trade and (3) actually injures competition with (4) resulting "antitrust injury" to the plaintiff. Brantley, 675 F.3d at 1197.; Auto. Sound Inc. v. Audiovox Elec. Corp., No. 12-762, 2012 WL 12892938, at *3 (C.D. Cal. Dec. 3, 2012).

      1.   Relevant Market

Generally, to demonstrate injury to competition, a plaintiff "must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1413 (9th Cir. 1991). "Without a definition of the market, there is no way to measure the defendant's ability to lessen or destroy competition." Am. Express, 138 S.Ct. at 2285 (internal alteration and quotation marks omitted). The relevant market is the "area of effective competition," including, where applicable, different products or services that serve as substitutes for each other. Id.; Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1446 (9th Cir. 1988) ("The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand."). The market, which must include a

geographical component, must also be a product market, and cannot be defined by reference to consumers.  <u>Newcal Indus., Inc. v. Ikon Office Sol.</u>, 513 F.3d 1038, 1045 (9th Cir. 2008).  Although the validity of an alleged market may present issues of fact, courts may dismiss antitrust complaints if the relevant market definition alleged is "facially unsustainable."  <u>Newcal</u>, 513 F.3d at 1038.

The instant complaint alleges that Disney is restraining trade in "the nationwide market for rentals and sales of movies on DVD, Blu-ray and digital platforms for home entertainment" (the "home movie" market).  (FAC ¶ 29.)  Disney argues that this definition is facially implausible because it fails to include economic substitutes, including cable television, digital streaming services such as Netflix, content platforms such as YouTube, and special events, such as the Olympics.  (Motion at 10.)  Disney further argues that the FAC fails to allege why such alternatives are not adequate substitutes for home movies.  (<u>Id.</u>)

Although the issue is a close one, this Court concludes that the alleged market is not so facially implausible as to warrant dismissal at the pleading stage.  Although Disney may, on summary judgment, be able to demonstrate that cable tv, streaming services, and the like are reasonably interchangeable with home movies, in the court's experience, that is not necessarily so.  A DVD, for example, can be viewed with little more than an inexpensive disc player and a video screen.  The supposed substitutes proposed by Disney, in contrast, generally require additional equipment, such as a cable box or receiver, some sort of internet capability and equipment, such as a modem or router, or, in the case of broadcast

1  television, a digital tuner.[3]  Furthermore, unlike the products in

2  the alleged market, the proposed alternatives appear to require

3  some sort of monthly or ongoing subscription, such as in the case

4  of Netflix or cable television, or must be viewed at set times, as

5  in the case of live sports or special events like the Olympics.[4]

6  Although the FAC does not explain why specific alternatives such as

7  cable tv and Netflix are not reasonable substitutes for home

---

9  [3] Cases like <u>Flash Elecs., Inc. v. Universal Music & Video
10 Distribution Corp.</u> and <u>Redbox Automated Retail LLC v. Universal
   City Studios LLLP</u> found markets such as "the whole distribution
   market for 'sell-through' and rental movie videos and DVDS" and
11 "the market for new release DVDs," respectively, to be facially
   plausible.  <u>Flash</u>, 312 F. Supp. 2d 379, 392 (E.D.N.Y. 2004);
12 <u>Universal City Studios</u>, No. CIV. 08-766RBK, 2009 WL 2588748, at *1
   (D. Del. Aug. 17, 2009).  These cases, which were decided a decade
13 or more ago, are not particularly instructive in this era of
   "smart" devices, particularly in light of Redbox's inclusion of
14 "digital platforms" in the alleged relevant market.  Indeed, with
   the increased prevalence of connected TVs and other devices, even
15 the hardware distinctions discussed above may become decreasingly
   relevant.  Whether that is already the case, however, or whether
16 "digital platforms" are part of the same market as DVDs and Blu-ray
   discs in the first instance, are questions best resolved at the
17 summary judgment stage.

18 [4] It bears noting that the cost of certain of the proposed
   alternatives, such as premium cable tv, may significantly exceed
19 the cost of home movies.  Granted, "the scope of the relevant
   market is not governed by the presence of a price differential
20 between competing products."  <u>Twin City Sportservice, Inc. v.
   Charles O. Finley & Co.</u>, 512 F.2d 1264, 1274 (9th Cir. 1975)  This
21 is not to say, however, that price is necessarily completely
   irrelevant.  Even where two products serve the same function, the
22 price differential may be so great that the "commercial reality" is
   that the products do not share a cross-elasticity of demand or
23 compete with each other.  <u>See Int'l Boxing Club of N. Y., Inc. v.
   United States</u>, 358 U.S. 242, 250 (1959) (quoting <u>United States v.
24 E. I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 404 (1956) ("[The
   relevant] market is composed of products that have reasonable
25 interchangeability for the purposes for which they are
   produced—price, use and qualities considered.")); <u>Thurman Indus.,
26 Inc. v. Pay 'N Pak Stores, Inc.</u>, 875 F.2d 1369, 1376 (9th Cir.
   1989) (20 percent price differential demonstrates low cross-
27 elasticity of demand) (discussing <u>Photovest Corp. v. Fotomat Corp.</u>,
   606 F.2d 704, 713 (7th Cir. 1979).

1  movies, it does allege that DVDs, Blu-rays, and "digital movies
2  generally require or can be used with equipment different from that
3  needed for games, books, and other forms of home entertainment,"
4  and that there is no cross-elasticity of demand between the
5  identified products and "games, books, and other forms of home
6  entertainment."  (FAC ¶ 31.)  Compare UGG Holdings, Inc. v. Severn,
7  No. CV04-1137-JFW FMOX, 2004 WL 5458426, at *4 (C.D. Cal. Oct. 1,
8  2004) (finding inadequately pleaded market where plaintiff made no
9  allegations or arguments as to why potential alternatives were not
10 substitutes and failed to allege lack of cross-elasticity of
11 demand).  The relevant market allegations here are sufficient to
12 survive a motion to dismiss.

13              2.  Market Power
14      Disney also argues that Redbox's claims fail because Redbox
15 has failed to allege that Disney possesses market power in the
16 market for home movies.  A plaintiff can show anticompetitive
17 effect in a relevant market either through direct proof of actual
18 adverse effects or indirectly, through "proof of 'market power'
19 plus some evidence that the challenged restraint harms
20 competition."  Am. Express, 138 S.Ct. at 2284; F.T.C. v. Indiana
21 Fed'n of Dentists, 476 U.S. 447, 460-61 (1986) ("Since the purpose
22 of the inquiries into market definition and market power is to
23 determine whether an arrangement has the potential for genuine
24 adverse effects on competition, proof of actual detrimental
25 effects, such as a reduction of output, can obviate the need for an
26 inquiry into market power, which is but a surrogate for detrimental
27 effects.") (internal quotations omitted); Oltz v. St. Peter's Cmty.
28 Hosp., 861 F.2d 1440, 1448 (9th Cir. 1988) ("Because market

definition and market power are merely tools designed to uncover
competitive harm, proof of 'actual detrimental effects, such as a
reduction of output, can obviate the need ... [for] elaborate
market analysis.'") (quoting <u>Indiana Fed'n of Dentists</u>, 476 U.S. at
460-61).[5]

Market share is the starting point for assessing market power.
<u>Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.</u>, 627 F.2d 919, 925 (9th
Cir. 1980).  The Ninth Circuit has found that an allegation that a
defendant controls sixty five percent of the relevant market is
sufficient to allege market power.  <u>Id.</u>; <u>see also</u> <u>Image Tech.</u>
<u>Servs., Inc. v. Eastman Kodak Co.</u>, 125 F.3d 1195, 1206 (9th Cir.
1997) ("Courts generally require a 65% market share to establish a
prima facie case of market power."); <u>Lucas v. Citizens Commc'ns</u>
<u>Co.</u>, 409 F. Supp. 2d 1206, 1220 (D. Haw. 2005).[6]  Here, the FAC
alleges that Disney's share of the home movies market is something
"greater" than fifty percent.  (FAC ¶¶ 34-35.)  Even if true,
however, that fact is not sufficient to establish Disney's market

---

[5] Although the Ninth Circuit stated in <u>Newcal</u> that "a
plaintiff must allege that the defendant has market power within a
relevant market," the court made no mention of <u>Oltz</u>, nor suggested
that a plaintiff must allege market power even in the face of
direct evidence of anticompetitive effect.  The Ninth Circuit's
reasoning in <u>Oltz</u> is consistent with the Supreme Court's recent
decision in <u>American Express</u> and earlier decision in <u>Indiana</u>
<u>Federation of Dentists</u>.  An entity that lacks market power cannot
act with anticompetitive effect.  Proof of such effect demonstrates
that the entity possessed the requisite power in the first
instance.  <u>See</u>, <u>e.g.</u>, <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 206 (2d
Cir. 2001) (explaining that actual evidence of adverse effects on
competition is a "strong indicator" of market power that renders
any further showing of market power unnecessary).

[6] The Ninth Circuit has also suggested that, in the context of
an attempted monopolization claim under Section 2 of the Sherman
Act, a lower market share may, depending on other factors, suffice.
<u>Rebel Oil Co. v. Atl. Richfield Co.</u>, 51 F.3d 1421, 1438 (9th Cir.
1995) (finding 44 percent share sufficient).

power in the home movies market.  <u>Image Tech. Servs.</u>, 125 F.3d at
1206.  Redbox nevertheless argues, as the FAC alleges, that Disney
has "a dominant position" in the home movies market due to the
"unique strength of the Disney brand."  (FAC ¶¶ 36-37.)  Such
conclusory assertions, however, are not entitled to a presumption
of truth.  Furthermore, Redbox does not cite, and this court is not
aware of, any authority for the proposition that general brand
strength demonstrates market power in a particular market.[7]
Although brand strength may be relevant in certain cases where a
single-brand market is alleged, that is not the case here, as
Redbox emphatically points out.[8]  <u>See</u> <u>Newcal</u>, 513 F.3d at 1046;
<u>Datel Holdings Ltd. v. Microsoft Corp.</u>, 712 F. Supp. 2d 974, 986
(N.D. Cal. 2010).  The court therefore agrees that the FAC does not
adequately allege that Disney possesses market power in the home
movies market.

       3.    Anticompetitive Effect

---

    [7] Some courts have discussed brand strength as a potential
barrier to entry in the context of monopolization claims, separate
and apart from market power.  <u>See</u>, <u>e.g.</u>, <u>Intergraph Corp. v. Intel
Corp.</u>, 3 F. Supp. 2d 1255, 1276 (N.D. Ala. 1998) (vacated on other
grounds, 195 F.3d 1346, 1363 (Fed. Cir. 1999)); <u>Com. of Pa. v.
Russell Stover Candies, Inc.</u>, No. CIV. 93-1972, 1993 WL 145264, at
*15 (E.D. Pa. May 6, 1993); <u>cf.</u> <u>Rebel Oil</u>, 51 F.3d at 1439-41.

    [8] Redbox does not allege a relevant market in either Disney-
branded products or Disney-branded movies.  Indeed, Redbox takes
exception to Disney's effort, such as it is, to characterize
Redbox's FAC as alleging any single-branded market.  (Opp. at 20 n.
9.)  Claims based upon the existence of any such market would
likely be difficult to sustain.  <u>See</u> <u>Streamcast Networks, Inc. v.
Skype Techs., S.A.</u>, 547 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007)
("Courts have consistently refused to consider one brand to be a
relevant market of its own when the brand competes with other
potential substitutes." (internal quotation omitted)).

1     The question remains, however, whether Redbox has sufficiently

2   alleged actual anticompetitive effects.[9]  If so, further

3   indications of market power may not be required.  <u>Indiana Fed'n of</u>

4   <u>Dentists</u>, 476 U.S. at 460-61; <u>Oltz</u>, 861 F.2d at 1448; <u>Todd</u>, 275

5   F.3d at 206.  With respect to anticompetitive effects, the FAC

6   alleges that Disney's misconduct "harms other rental outlets that

7   provide a less expensive alternative for viewing Disney content,"

8   "directly affects other low-cost rental options[, . . . and]

9   reduces output and raises prices for consumers," and that Disney's

10  "limitation on the numbers of copies available for purchase will

11  hurt 'Mom and Pop rental companies' as well."  (FAC ¶¶ 6, 80, 58.)

12  Redbox also alleges that, as a result of Disney's actions, many

13  Redbox customers "are unable to turn to other retailers <u>for Disney</u>

14  <u>titles</u>."  (FAC ¶ 77 (emphasis added).)  The FAC further states that

15  "Redbox's inability to purchase adequate numbers of Disney movies

16  therefore represents an absolute reduction in output <u>in this</u>

17  <u>market</u>."  (FAC ¶ 78 (emphasis added).)

18     As discussed above, however, anticompetitive effects can only

19  be measured by reference to a particular market.  <u>Am. Express</u>, 138

20  S.Ct. at 2285.  The relevant market at issue here, as discussed

21  above, is the home movie market for "rentals and sales of movies on

22  DVD, Blu-ray and digital platforms."  Redbox's allegations

23

24     [9] Disney's arguments, like some of the cases in this subject
    area, appear to conflate injury to competition with antitrust
25  injury.  (<u>See</u>, <u>e.g.</u>, Mot. at 8:22; Reply at 2:27-28 (quoting <u>In re</u>
    <u>Webkinz Antitrust Litig.</u>, 695 F. Supp. 2d 987, 997 (N.D. Cal.
26  2010)).)  "[I]n order to state a claim successfully, plaintiffs
    must allege both that defendant's behavior is anticompetitive and
27  that plaintiff has been injured by an anti-competitive aspect of
    the practice under scrutiny."  <u>Brantley</u>, 675 F.3d at 1200 (internal
28  quotations omitted).  The latter element is referred to as
    "antitrust injury" or "antitrust standing."  <u>Id.</u> at 1197.

1  regarding anticompetitive effects in the market for "Disney titles"

2  are therefore irrelevant.  The FAC includes no allegations about

3  anticomptetitive effects in the relevant, broader market for home

4  movies generally.[10]  Neither does the FAC allege any concrete, non-

5  conclusory allegations about how retailers other than Redbox are

6  harmed by Disney's refusal to deal with Redbox.  See Brantley, 675

7  F.3d at 1198 ("[P]laintiffs must plead an injury to competition

8  beyond the impact on the plaintiffs themselves.").  Indeed, "[a]

9  manufacturer may choose those with whom it wishes to deal and

10  unilaterally may refuse to deal with a distributor or customer for

11  business reasons without running afoul of the antitrust laws."[11]

12  Dimidowich v. Bell & Howell, 803 F.2d 1473, 1478 (9th Cir. 1986).

13      Because Redbox has not adequately alleged either that Disney

14  possesses market power in the market for home movies or that

15  Disney's actions have had actual anticompetitive effects in that

16  market, its antitrust claims are dismissed, with leave to amend.

17      B.   Declaratory Relief

18      The FAC's first cause of action for "Declaratory Relief" seeks

19  a declaration that certain language on Disney's Combo Pack

20

21      [10] Even assuming the reference to reduced output and higher
22  consumer prices refers to that broader market, "allegations that an
    agreement has the effect of reducing consumers' choices or
23  increasing prices to consumers does not sufficiently allege an
    injury to competition."  Brantley, 675 F.3d at 1202.

24

25      [11] The Ninth Circuit did recognize, however, that a vertical
    combination might violate antitrust laws where a manufacturer
26  coerces a distributor into adhering to resale restraints.
    Dimidowich, 803 F.3d at 1478.  Although the FAC here does make
27  several conclusory references to coercive conduct, it provides no
    specifics as to how Disney coerced distributors into involuntarily
28  refusing to sell to Redbox, notwithstanding allegations that Disney
    harassed Redbox itself.

packaging and websites is unenforceable.  (FAC ¶¶ 105.)
Specifically, the FAC identifies terms stating that Disney owns
"all digital movie codes," that codes "are not for sale or
transfer, and that "digital codes are authorized for redemption
only by an individual who obtains the code as part of a
combinations disc + code package . . ., or by a family member of
that individual."  (FAC ¶¶ 61, 99, 100.)  Although the first cause
of action does not itself specify why these terms are allegedly
unenforceable, the declaratory relief claim appears to be based
upon allegations that the terms are unconscionable.  (FAC ¶¶ 65,
70.)  Disney argues that, assuming that to be the case, the FAC
nevertheless fails to allege the elements of an unconscionability
defense.

Under California law, a contract is invalid if it is both
procedurally and substantively unconscionable.  Armendariz v.
Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 114 (2000).
Procedural unconscionability "concerns the manner in which the
contract was negotiated and the respective circumstances of the
parties at that time."  Ferguson v. Countrywide Credit Indus.,
Inc., 298 F.3d 778, 783 (9th Cir. 2002).  A procedural
unconscionability analysis looks to two factors:(1) oppression,
which focuses on bargaining power disparity and the resulting
absence of meaningful choice, and (2) surprise, which turns on
whether operative terms are hidden in lengthy forms drafted by the
party seeking to enforce the contract.  Id.  "A contract is
substantively unconscionable when it is so unjustifiably one-sided
that it 'shock[s] the conscience.'"  Chavarria v. Ralphs Grocery

1  Co., 733 F.3d 916, 923 (9th Cir. 2013) (quoting Parada v. Superior

2  Court, 176 Cal. App. 4th 1554, 1573 (2009)).

3       Notwithstanding conclusory allegations that "the contract

4  terms" are unconscionable, the FAC here does not adequately allege

5  procedural or substantive unconscionability.  Although the FAC

6  makes no explicit mention of procedural unconscionability, it does

7  allege that contractual terms restricting the transfer of digital

8  codes only arise after consumers have already purchased the codes.

9  (FAC ¶ 110.)  This allegation of surprise, Redbox argues, is

10 sufficient to satisfy the procedural unconscionability element of

11 the defense.  The court disagrees.  As the FAC acknowledges, the

12 Combo Pack boxes, which consumers encounter before they ever reach

13 the websites, state that "codes are not for sale or transfer."

14 (FAC ¶ 99.)  It is not plausible, therefore, that consumers are

15 surprised when they see similar terms on the redemption websites.

16      Redbox's argument regarding substantive unconscionability is

17 also unavailing.  Redbox contends that the website terms are

18 substantively unconscionable because, by requiring "consumers to

19 certify that they did not purchase the codes separately, even if

20 they had already done so," the terms "effectively result[] in a

21 forfeiture because consumers cannot redeem the Code without making

22 a false certification."  (Opp. at 8:19.)  Even on the face of the

23 FAC, however, that allegation is simply untrue, at least as it

24 applies to purchasers of Combo Packs, whose certifications would be

25 accurate and truthful.  Insofar as Redbox refers to its own

26 customers, or other purchasers of standalone codes, Redbox cannot

27 plausibly seek to lay any lack of prior disclosure, or resulting

28 "forfeiture," at Disney's feet.  The website terms are consistent

with the box-top disclosure that "codes are not for sale or transfer."  The redemption websites' subsequent elaboration on that theme does not appear to require any consumer to forfeit any right he or she possessed, let alone shocks the conscience.  To the extent standalone code purchasers, who never have any interaction with Disney or exposure to Disney packaging at the point of purchase, are frustrated in their efforts to redeem the purchased code, that frustration would appear to be a product of Redbox's packaging decisions and the nature of Redbox's characterization of the rights being conveyed.[12]  Redbox's declaratory relief claim is, therefore, dismissed, with leave to amend.

C.   Copyright Misuse

Disney also argues that Count Two of the FAC, which alleges copyright misuse, must be dismissed.  As an initial matter, courts are split on the question whether copyright misuse may be brought as an affirmative claim, as opposed to as a defense.  See, e.g., Amaretto Ranch Breedables, LLC v. Ozimals, Inc., 790 F. Supp. 2d 1024, 1033 (N.D. Cal. 2011); KTS Karaoke, Inc. v. Sony/ATV Music Publ'g LLC, No. CV1200014MWF, 2014 WL 12567169, at *3 (C.D. Cal. Jan. 14, 2014).  This court need not address the split, however, because even assuming that copyright misuse can be brought as an affirmative claim, Redbox does not sufficiently allege misuse.

_____

[12] Redbox's substantive unconscionability argument does not discuss first sale doctrine issues, but appears to rely upon them, at least implicitly.  If the first sale doctrine guaranteed Redbox the right to transfer digital codes, Redbox would certainly have a stronger claim of substantive unconscionability.  As explained below, however, and in great detail in the related Redbox I case, the first sale doctrine is not applicable here.  See Section III(C) and note 13, infra; Redbox I, Dkt. 74, 120.

1    This Court addressed the copyright misuse issue in great

2   detail in two orders in the related case, and will not re-hash that

3   entire discussion here.  (Redbox I, Dkt. 74, 120.)  In short,

4   copyright misuse is an affirmative defense that "prevents copyright

5   holders from leveraging their limited monopoly to allow them

6   control of areas outside the monopoly," and extends to any

7   situation implicating "the public policy embodied in the grant of a

8   copyright."  A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004,

9   1026 (9th Cir. 2001).  Redbox alleges that Disney engaged in

10  copyright misuse by (1) burdening consumers' ability to sell the

11  physical movie disc components of Combo Packs by imposing

12  restrictive license terms on the download codes, (2) impinging upon

13  distributors' first-sale rights by preventing downstream sales to

14  Redbox, and (3) restricting the resale of digital codes without

15  purchasers' assent.  (FAC ¶¶ 109-112.)  None of these theories is

16  viable.

17    First, the license terms applicable to download codes allow

18  Combo Pack purchasers and recipients to enjoy digital access

19  regardless whether they keep or dispose of the physical discs.

20  Digital access is conditioned not on possession of physical discs,

21  but on the manner in which the redeemer acquired the download code.

22  A Combo Pack owner who disposes of the discs is left with the same

23  digital access rights he or she always enjoyed.  Nor is a consumer

24  who wishes to access a digital Disney movie required to purchase

25  discs.  As the FAC acknowledges, consumers can access movies

26  digitally through services such as iTunes.  (FAC ¶ 10.)

27    Second, an agreement between Disney and its distributors to

28  forbid downstream sales to Redbox does not infringe upon the

distributors' first sale rights.[13]  "That the purchasers of
copyrighted goods can agree to limit their commercial conduct
through contract is undeniable."  Estate of Graham v. Sotheby's,
Inc., 178 F. Supp. 3d 974, 983 (C.D. Cal. 2016), *reversed in part
on other grounds by* Close v. Sotheby's, Inc., 894 F.3d 1061 (9th
Cir. 2018), (citing United States v. Wise, 550 F.2d 1180, 1187 n.
10 (1977) ("If the vendee breaches an agreement not to sell [a]
copy, he may be liable for the breach but he is not guilty of
infringement.")); see also Metro-Goldwyn-Mayer Studios, Inc. v.
Grokster, Ltd., 454 F. Supp. 2d 966, 997 (C.D. Cal. 2006) ("The
right to exclude is inherent in the grant of a copyright; a
copyright is not improperly expanded simply because the owner has
exercised his or her power to exclude.").

Lastly, Redbox's argument that the restrictions on the sale of
re-sale codes are imposed without the assent of purchasers appears
to rely upon the first sale doctrine.[14]  As explained in Redbox I,
however, the first sale doctrine is inapplicable to digital codes.
The first sale doctrine applies to "particular" copies that exist
in the material world.  See 17 U.S.C. § 101; Redbox I, Dkt. 74 at
19-24.  Here, no such physical object exists when a standalone code
is transferred, or prior to the time that that code is redeemed and
the copyrighted work is fixed onto the downloader's physical hard

---

[13] The first sale doctrine allows the "owner of a particular
copy or phonorecord lawfully made under [the Copyright Act] . . .
to sell or otherwise dispose of the possession of that copy or
phonorecord," without the permission of the copyright holder.  UMG
v. Augusto, 628 F.3d 1175, 1180 (9th Cir. 2011) (quoting 17 U.S.C.
§ 109(a)); Bobbs-Merrill Co. v. Strauss, 210 U.S. 339, 341 (1908).

[14] See note 13, above.

1   drive.  Restrictions on resales of digital codes do not, therefore,

2   face the same first sale doctrine obstacles that would apply to

3   similar restrictions on physical discs.  Accordingly, Redbox's

4   copyright misuse claim is dismissed, with leave to amend.[15]

5        D.   Tortious Interference

6        Disney also seeks to dismiss Redbox's claim for tortious

7   interference with prospective economic advantage.  An intentional

8   interference with prospective economic relations claim requires (1)

9   an economic relationship between plaintiff and a third party with

10  the probability of future economic benefit to the plaintiff, (2)

11  defendant's knowledge of that relationship, (3) defendant's

12  intentional, independently wrongful act to disrupt the

13  relationship, (4) actual disruption, and (5) economic harm to the

14  plaintiff.  Marsh v. Anesthesia Serv. Med. Group. Inc., 200

15  Cal.App.4th 480, 504 (2011) (citing Korea Supply v. Lockheed Martin

16  Corp., 29 Cal.4th 1134, 1153 (2003)).  Disney argues, essentially,

17  that Redbox has not alleged any wrongful acts.

18       Redbox alleges that Disney has harassed Redbox employees in

19  retail stores and "coerced" distributors into refusing to sell to

20  Redbox, including by stating, falsely, that Redbox cannot legally

21  resell download codes.[16]  (FAC ¶ 50, 52-56, 119.)  As discussed

22  above, however, there is nothing inherently improper with Disney

23  entering into restrictive agreements with its distributors.

24

25       [15] Redbox's position regarding standing to assert a copyright
     misuse claim also appears to be rooted in the first sale doctrine.

26       [16] Redbox's argument with respect to Disney's statements
27   regarding the legality of Redbox's business model is largely
     premised on the same arguments Redbox raises in support of its
28   copyright misuse claim.  That claim, however, is not viable, as
     discussed above.

Dimidowich, 803 F.3d at 1478; Estate of Graham, 178 F. Supp. 3d at
983.  Although the FAC does allege that Disney "coerced" its
distributors into entering into restrictive agreements, those
allegations are conclusory.  So too are Redbox's allegations of
"harassment."  Although the FAC does allege some specific conduct,
such as "confronting" Redbox employees in retail stores, the FAC
does not allege how such conduct was unlawful.

Redbox also premises its interference claims upon Disney's
allegedly false statements, namely Disney's assertions "that
Redbox's rental and sale of products included in Disney Combo
Packs, and in particular the digital movie codes, are unauthorized
and illegal."  (FAC ¶ 119.)  Under the Noerr-Pennington doctrine,
however, parties are immune from liability for claims, including
state law tort claims, related to litigation conduct.  Theme
Promotions, Inc. v. News Am. Mktg. FSI, 546 F.3d 991, 1006-07 (9th
Cir. 2008).  That privilege extends to "conduct incidental to a
lawsuit" or "ancillary to litigation."  Id. at 1006; Thomas v.
Hous. Auth. of Cty. of Los Angeles, No. CV04-6970 MMM (RCX), 2005
WL 6136440, at *12 (C.D. Cal. June 3, 2005); see also EcoDisc Tech.
AG v. DVD Format/Logo Licensing Corp., 711 F. Supp. 2d 1074, 1082
(C.D. Cal. 2010) (finding website announcements and communications
with licensees within the ambit of Noerr-Pennington protection).
The statements alleged here are no more than a recitation to Disney
distributors and website viewers of Disney's litigation position
here and in Redbox I.  Because the FAC does not adequately allege
any wrongful acts, Redbox's tortious interference claim are
dismissed, with leave to amend.

E.    False Advertising

1   Disney also contends that Redbox has not sufficiently alleged
2   claims for false advertising premised upon either (1) Disney's
3   litigation-related statements or (2) the terms stated on Combo Pack
4   boxes and Disney's websites.  With respect to the former, the
5   parties' discussion is duplicative of the Noerr-Pennington issue
6   discussed above, and Redbox's false advertising claims fail for the
7   reasons stated above.  As to the latter, Disney argues that Redbox
8   lacks statutory standing to assert false advertising claims on the
9   basis of any of the alleged misrepresentations on Combo Pack boxes
10  or Disney websites.

11      Standing under California's False Advertising law is limited
12  to "any person who has suffered injury in fact and has lost money
13  or property as a result of" a defendant's alleged
14  misrepresentations.  Kwikset Corp. v. Superior Court, 51 Cal. 4th
15  310, 321 (2011) (quoting California Business & Professions Code §
16  17535).  Most courts have interpreted the FAL's "as a result of"
17  language to require that Plaintiffs "allege their own reliance on
18  the alleged misrepresentations, rather than the reliance of third
19  parties."  L.A. Taxi Coop., Inc. v. Uber Techs., Inc., 114 F. Supp.
20  3d 852, 866-67 (N.D. Cal. 2015).  Here, Redbox does not allege that
21  it relied upon any of the terms displayed on Disney Combo Pack
22  boxes or websites.  Rather, Redbox alleges that consumers who might
23  otherwise have purchased download codes from Redbox saw Disney's
24  misrepresentations and then refrained from purchasing codes from
25  Redbox on the basis of those misrepresentations.  Such consumer
26  reliance, absent Redbox's own actual reliance, is insufficient to
27  confer statutory standing under California's false advertising law.
28

1    See Youngevity Int'l, Corp. v. Smith, 224 F. Supp. 3d 1022, 1031

2    (S.D. Cal. 2016).

3         Statutory standing under the Lanham Act, however, is broader.

4    The Lanham Acts permits suits "by 'any person who believes that he

5    or she is likely to be damaged' by a defendant's false

6    advertising."  Lexmark Int'l, Inc. v. Static Control Components,

7    Inc., 572 U.S. 118, 129 (2014) (quoting 15 U.S.C. § 1125(a)).  A

8    Lanham Act plaintiff need only show that (1) his interests fall

9    within the "zone of interests" protected by the statute and (2) his

10   injuries are proximately caused by a violation of the statute.  Id.

11   at 129, 132; Obesity Research Inst., LLC v. Fiber Research Int'l,

12   LLC, 165 F. Supp. 3d 937, 946 (S.D. Cal. 2016).  Disney argues that

13   the FAC fails to allege the latter of these elements.

14        The FAC alleges that Disney falsely states that Disney owns

15   all download codes, which can only be redeemed by recipients of

16   Combo Packs and cannot be transferred separately.  (FAC ¶¶ 60-62,

17   99-100, 127-128.)  These misrepresentations, Redbox alleges,

18   deceive consumers "into believing that Redbox does not have title

19   to the components of Combo Packs it has purchased and therefore

20   that consumers may not lawfully purchase those components from

21   Redbox."[17]  (FAC ¶132.)  Nowhere, however, does the FAC allege that

22   consumers who purchase a standalone download code from Redbox ever

23   see Disney's original Combo Pack packaging or know that Redbox

24   obtains its code products from Disney Combo packs.  The court

25   _____

26        [17] These allegations are sufficient to satisfy the
     particularity requirement of Federal Rule of Civil Procedure 9(b).
27   See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir.
     2003); Bobbleheads.com, LLC v. Wright Bros., Inc., 259 F. Supp. 3d
28   1087, 1095 (S.D. Cal. 2017).

1   therefore agrees that, to the extent Redbox's Lanham Act standing

2   is predicated upon Disney's Combo Pack statements, Redbox has not

3   adequately alleged that those statements proximately cause Redbox's

4   loss of sales.

5        The issue is closer, however, with respect to alleged

6   misrepresentations made on Disney websites.  Although Redbox

7   consumers do not ever encounter Disney's Combo Pack packaging, code

8   purchasers cannot redeem download codes without viewing Disney's

9   redemption website terms, including representations that Disney

10  owns the download codes and that codes cannot be redeemed by

11  standalone purchasers.  (FAC ¶ 100.)  Disney argues that these

12  representations cannot lead to lost sales for Redbox unless a

13  consumer "determines that Redbox is engaged in unlawful conduct . .

14  . and decides not to buy additional Codes from Redbox . . . ."

15  (Reply at 24:24-25.)  That appears, however, to be precisely what

16  Redbox alleges.  (See FAC ¶ 132 ("Consumers are likely to be

17  deceived into believing that Redbox does not have title to the

18  [download codes] it has purchased and therefore that consumers may

19  not lawfully purchase those components from Redbox.")  Redbox has,

20  therefore, alleged statutory standing under the Lanham Act.

21  **IV.  Conclusion**

22       For the reasons stated above, Disney's Motion to Dismiss is

23  GRANTED, in part and DENIED, in part.  The motion is denied with

24  respect to the Fourth and Sixth Causes of Action.[18]  The motion is

25  granted with respect to all other claims.  Accordingly, the First,

26  ────────────────

27       [18] Disney acknowledges that Redbox's Sixth Cause of Action for
    unfair competition rises or falls with the remainder of Redbox's

28  claims.  Because Redbox's Lanham Act claim survives, so too does
    its unfair competition claim under California Business .

1  Second, Third, Fifth, Seventh, and Eighth Causes of Action are

2  DISMISSED, with leave to amend.  Any amended complaint shall be

3  filed with twenty one days of the date of this Order.

19  IT IS SO ORDERED.

22  Dated: July 17, 2019

DEAN D. PREGERSON
United States District Judge